## Documents Related to Administrative Process Including Transcript of Oral Hearing, if applicable

Civil Action Number: 2:17-01146
Claimant:            Trish Ann Fontana
Account Number:      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

| Court Transcript Index | Page No. | No. of Pages |
|---|---|---|
| AC Denial (ACDENY), dated 06/30/2017 | 1-7 | 7 |
| ALJ Hearing Decision (ALJDEC), dated 01/29/2015 | 8-23 | 16 |
| Claimant-supplied Evidence (CLMTEVID), dated 09/15/2016 to 10/10/2016, from Dr. Jory Richman | 24-28 | 5 |
| Claimant-supplied Evidence (CLMTEVID), dated 12/21/2015 to 06/16/2016, from UPMC | 29-32 | 4 |
| Claimant-supplied Evidence (CLMTEVID), dated 06/09/2015, from Dr. Jory Richman | 33 | 1 |
| Transcript of Oral Hearing (TRANHR), dated 12/03/2014 | 34-60 | 27 |

DATE: April 18, 2018

The documents and exhibits contained in this administrative record are the best copies obtainable.

SOCIAL SECURITY ADMINISTRATION

**Refer to:** TLC
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

Office of Disability Adjudication
and Review
5107 Leesburg Pike
Falls Church, VA 22041-3255
Telephone: (877) 670-2722
Date: June 30, 2017

## NOTICE OF APPEALS COUNCIL ACTION

Ms. Trish Ann Fontana
3130 Glendale Avenue
Pittsburgh, PA 15227

This is about your request for review of the Administrative Law Judge's decision dated
January 29, 2015.  You submitted reasons that you disagree with the decision.  We considered
the reasons and exhibited them on the enclosed Order of the Appeals Council.  We found that the
reasons do not provide a basis for changing the Administrative Law Judge's decision.

### We Have Denied Your Request for Review

We found no reason under our rules to review the Administrative Law Judge's decision.
Therefore, we have denied your request for review.

This means that the Administrative Law Judge's decision is the final decision of the
Commissioner of Social Security in your case.

### Rules We Applied

We applied the laws, regulations and rulings in effect as of the date we took this action.

Under our rules, we will review your case for any of the following reasons:

- The Administrative Law Judge appears to have abused his or her discretion.

- There is an error of law.

- The decision is not supported by substantial evidence.

- There is a broad policy or procedural issue that may affect the public interest.

**Suspect Social Security Fraud?**
**Please visit http://oig.ssa.gov/r or call the Inspector General's Fraud Hotline
at 1-800-269-0271 (TTY 1-866-501-2101).**

**1**

**See Next Page**

- We receive additional evidence that you show is new, material, and relates to the period on or before the date of the hearing decision. You must also show there is a reasonable probability that the additional evidence would change the outcome of the decision. You must show good cause for why you missed informing us about or submitting it earlier.

You submitted evidence from Dr. Jory D. Richman, dated September 15, 2016 through October, 10, 2016 (5pages), the evidence from UPMC, dated December 21, 2015 through June 16, 2016 (4 pages), and the letter from Dr. Jory D. Richman, dated June 9, 2015 (1 page). We find this evidence does not show a reasonable probability that it would change the outcome of the decision. We did not consider and exhibit this evidence.

**If You Disagree With Our Action**

If you disagree with our action, you may ask for court review of the Administrative Law Judge's decision by filing a civil action.

If you do not ask for court review, the Administrative Law Judge's decision will be a final decision that can be changed only under special rules.

**How to File a Civil Action**

You may file a civil action (ask for court review) by filing a complaint in the United States District Court for the judicial district in which you live. The complaint should name the Commissioner of Social Security as the defendant and should include the Social Security number(s) shown at the top of this letter.

You or your representative must deliver copies of your complaint and of the summons issued by the court to the U.S. Attorney for the judicial district where you file your complaint, as provided in rule 4(i) of the Federal Rules of Civil Procedure.

You or your representative must also send copies of the complaint and summons, by certified or registered mail, to the Social Security Administration's Office of the General Counsel that is responsible for the processing and handling of litigation in the particular judicial district in which the complaint is filed. The names, addresses, and jurisdictional responsibilities of these offices are published in the Federal Register (70 FR 73320, December 9, 2005), and are available on–line at the Social Security Administration's Internet site, http://policy.ssa.gov/poms.nsf/links/0203106020.

You or your representative must also send copies of the complaint and summons, by certified or registered mail, to the Attorney General of the United States, Washington, DC  20530.

**Time To File a Civil Action**

- You have 60 days to file a civil action (ask for court review).

- The 60 days start the day after you receive this letter.  We assume you received this letter 5 days after the date on it unless you show us that you did not receive it within the 5-day period.

- If you cannot file for court review within 60 days, you may ask the Appeals Council to extend your time to file.  You must have a good reason for waiting more than 60 days to ask for court review.  You must make the request in writing and give your reason(s) in the request.

You must mail your request for more time to the Appeals Council at the address shown at the top of this notice.  Please put the Social Security number(s) also shown at the top of this notice on your request.  We will send you a letter telling you whether your request for more time has been granted.

**About The Law**

The right to court review for claims under Title II (Social Security) is provided for in Section 205(g) of the Social Security Act.  This section is also Section 405(g) of Title 42 of the United States Code.

The right to court review for claims under Title XVI (Supplemental Security Income) is provided for in Section 1631(c)(3) of the Social Security Act.  This section is also Section 1383(c) of Title 42 of the United States Code.

The rules on filing civil actions are Rules 4(c) and (i) in the Federal Rules of Civil Procedure.

Trish Ann Fontana (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)                                    Page 4 of 4

**If You Have Any Questions**

If you have any questions, you may call, write, or visit any Social Security office.  If you do
call or visit an office, please have this notice with you.  The telephone number of the local
office that serves your area is (888)717-1525.  Its address is:

> Social Security
> 650 Washington Road
> Suite 120
> Pittsburgh, PA 15228-2706

/s/ *Aimee E. Durel*
_____
Aimee E. Durel
Appeals Officer

Enclosure:  Order of Appeals Council

cc:  Lawrence Bolind
      238 Main Street
      Imperial, PA 15126

**4**

Trish Ann Fontana                                    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
Claimant                                             Social Security Number


Wage Earner                                          Social Security Number


## AC EXHIBITS LIST


| EXHIBIT NO. | DESCRIPTION | NO. OF PAGES | COURT TRANSCRIPT PAGE NO. |
|---|---|---|---|
| Exhibit 10B | Request for Review, dated April 6, 2015 (3 pages) | | |

**5**

Social Security Administration
OFFICE OF DISABILITY ADJUDICATION AND REVIEW

**ORDER OF APPEALS COUNCIL**

| IN THE CASE OF | CLAIM FOR |
|---|---|
| | Period of Disability |
| | Disability Insurance Benefits |
| Trish Ann Fontana | |
| (Claimant) | |
| | 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 |
| (Wage Earner) | (Social Security Number) |

The Appeals Council has received additional evidence which it is making part of the record. That evidence consists of the following exhibits:

Exhibit 10B        Request for Review, dated April 6, 2015 (3 pages)

Date: June 30, 2017

**6**

Lawrence Bolind
238 Main Street
Imperial, PA 15126

--------------------------------------------------------------------------------

--------------------------------------------------------------------------------

**7**

**SOCIAL SECURITY ADMINISTRATION**

Refer To: 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

Office of Disability Adjudication and Review
SSA ODAR Hearing Office
Suite 2308
1000 Liberty Avenue
Pittsburgh, PA 15222-4023

Date: January 29, 2015

Trish Ann Fontana
3130 Glendale Ave
Pittsburgh, PA 15227

## Notice of Decision – Unfavorable

I carefully reviewed the facts of your case and made the enclosed decision. Please read this notice and my decision.

**If You Disagree With My Decision**

If you disagree with my decision, you may file an appeal with the Appeals Council.

**How To File An Appeal**

To file an appeal you or your representative must ask in writing that the Appeals Council review my decision. You may use our Request for Review form (HA-520) or write a letter. The form is available at www.socialsecurity.gov. Please put the Social Security number shown above on any appeal you file. If you need help, you may file in person at any Social Security or hearing office.

Please send your request to:

**Appeals Council**
**Office of Disability Adjudication and Review**
**5107 Leesburg Pike**
**Falls Church, VA 22041-3255**

**Time Limit To File An Appeal**

You must file your written appeal **within 60 days** of the date you get this notice. The Appeals Council assumes you got this notice 5 days after the date of the notice unless you show you did not get it within the 5-day period.

The Appeals Council will dismiss a late request unless you show you had a good reason for not filing it on time.

Form HA-L76-OP2 (03-2010)

**8**

Trish Ann Fontana (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)                                    Page 2 of 3

**What Else You May Send Us**

You or your representative may send us a written statement about your case. You may also send us new evidence. You should send your written statement and any new evidence **with your appeal**. Sending your written statement and any new evidence with your appeal may help us review your case sooner.

**How An Appeal Works**

The Appeals Council will consider your entire case. It will consider all of my decision, even the parts with which you agree. Review can make any part of my decision more or less favorable or unfavorable to you. The rules the Appeals Council uses are in the Code of Federal Regulations, Title 20, Chapter III, Part 404 (Subpart J).

The Appeals Council may:

- Deny your appeal,
- Return your case to me or another administrative law judge for a new decision,
- Issue its own decision, or
- Dismiss your case.

The Appeals Council will send you a notice telling you what it decides to do. If the Appeals Council denies your appeal, my decision will become the final decision.

**The Appeals Council May Review My Decision On Its Own**

The Appeals Council may review my decision even if you do not appeal. If the Appeals Council reviews your case on its own, it will send you a notice within 60 days of the date of this notice.

**When There Is No Appeals Council Review**

If you do not appeal and the Appeals Council does not review my decision on its own, my decision will become final. A final decision can be changed only under special circumstances. You will not have the right to Federal court review.

**New Application**

You have the right to file a new application at any time, but filing a new application is not the same as appealing this decision. If you disagree with my decision and you file a new application instead of appealing, you might lose some benefits or not qualify for benefits at all. My decision could also be used to deny a new application for benefits if the facts and issues are the same. If you disagree with my decision, you should file an appeal within 60 days.

Trish Ann Fontana (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)                                        Page 3 of 3

**If You Have Any Questions**

We invite you to visit our website located at www.socialsecurity.gov to find answers to general questions about social security.  You may also call (800) 772-1213 with questions.  If you are deaf or hard of hearing, please use our TTY number (800) 325-0778.

If you have any other questions, please call, write, or visit any Social Security office.  Please have this notice and decision with you.  The telephone number of the local office that serves your area is (888)717-1525.  Its address is:

>           Social Security
>           650 Washington Road
>           Suite 120
>           Pittsburgh, PA 15228-2706


>           John J. Porter
>           Administrative Law Judge


Enclosures:
Decision Rationale
Form HA-L39 (Exhibit List)



cc:     Lawrence Bolind, Esq.
        238 Main Street
        Imperial, PA 15126

**SOCIAL SECURITY ADMINISTRATION**
**Office of Disability Adjudication and Review**

**DECISION**

<u>**IN THE CASE OF**</u>

Trish Ann Fontana
_____
(Claimant)

_____
(Wage Earner)

<u>**CLAIM FOR**</u>

Period of Disability and Disability Insurance
Benefits
_____
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
_____
(Social Security Number)

<u>**JURISDICTION AND PROCEDURAL HISTORY**</u>

On March 20, 2013, the claimant protectively filed a Title II application for a period of disability and disability insurance benefits, alleging disability beginning June 6, 2011.  The claim was denied initially on July 10, 2013.  Thereafter, the claimant filed a written request for hearing on September 13, 2013 (20 CFR 404.929 *et seq.*).  The claimant appeared and testified at a hearing held on December 3, 2014, in Pittsburgh, PA.  Samuel E. Edelmann, an impartial vocational expert, also appeared at the hearing.  The claimant is represented by Lawrence Bolind, an attorney.

<u>**ISSUES**</u>

The issue is whether the claimant is disabled under sections 216(i) and 223(d) of the Social Security Act.  Disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment or combination of impairments that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months.

There is an additional issue whether the insured status requirements of sections 216(i) and 223 of the Social Security Act are met.  The claimant's earnings record shows that the claimant has acquired sufficient quarters of coverage to remain insured through March 31, 2015.  Thus, the claimant must establish disability on or before that date in order to be entitled to a period of disability and disability insurance benefits.

After careful consideration of all the evidence, I conclude the claimant has not been under a disability within the meaning of the Social Security Act from June 6, 2011, through the date of this decision.

<u>**APPLICABLE LAW**</u>

Under the authority of the Social Security Act, the Social Security Administration has established a five-step sequential evaluation process for determining whether an individual is disabled (20 CFR 404.1520(a)).  The steps are followed in order.  If it is determined that the

claimant is or is not disabled at a step of the evaluation process, the evaluation will not go on to the next step.

At step one, I must determine whether the claimant is engaging in substantial gainful activity (20 CFR 404.1520(b)).  Substantial gainful activity (SGA) is defined as work activity that is both substantial and gainful.  "Substantial work activity" is work activity that involves doing significant physical or mental activities (20 CFR 404.1572(a)).  "Gainful work activity" is work that is usually done for pay or profit, whether or not a profit is realized (20 CFR 404.1572(b)).  Generally, if an individual has earnings from employment or self-employment above a specific level set out in the regulations, it is presumed that she has demonstrated the ability to engage in SGA (20 CFR 404.1574 and 404.1575).  If an individual engages in SGA, she is not disabled regardless of how severe her physical or mental impairments are and regardless of her age, education, and work experience.  If the individual is not engaging in SGA, the analysis proceeds to the second step.

At step two, I must determine whether the claimant has a medically determinable impairment that is "severe" or a combination of impairments that is "severe" (20 CFR 404.1520(c)).  An impairment or combination of impairments is "severe" within the meaning of the regulations if it significantly limits an individual's ability to perform basic work activities.  An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work (20 CFR 404.1521; Social Security Rulings (SSRs) 85-28, 96-3p, and 96-4p).  If the claimant does not have a severe medically determinable impairment or combination of impairments, she is not disabled.  If the claimant has a severe impairment or combination of impairments, the analysis proceeds to the third step.

At step three, I must determine whether the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526).  If the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of a listing and meets the duration requirement (20 CFR 404.1509), the claimant is disabled.  If it does not, the analysis proceeds to the next step.

Before considering step four of the sequential evaluation process, I must first determine the claimant's residual functional capacity (20 CFR 404.1520(e)).  An individual's residual functional capacity is her ability to do physical and mental work activities on a sustained basis despite limitations from her impairments.  In making this finding, I must consider all of the claimant's impairments, including impairments that are not severe (20 CFR 404.1520(e) and 404.1545; SSR 96-8p).

Next, I must determine at step four whether the claimant has the residual functional capacity to perform the requirements of her past relevant work (20 CFR 404.1520(f)).  The term past relevant work means work performed (either as the claimant actually performed it or as it is generally performed in the national economy) within the last 15 years or 15 years prior to the date that disability must be established.  In addition, the work must have lasted long enough for the claimant to learn to do the job and have been SGA (20 CFR 404.1560(b) and 404.1565).  If

the claimant has the residual functional capacity to do her past relevant work, the claimant is not disabled.  If the claimant is unable to do any past relevant work or does not have any past relevant work, the analysis proceeds to the fifth and last step.

At the last step of the sequential evaluation process (20 CFR 404.1520(g)), I must determine whether the claimant is able to do any other work considering her residual functional capacity, age, education, and work experience.  If the claimant is able to do other work, she is not disabled.  If the claimant is not able to do other work and meets the duration requirement, she is disabled.  Although the claimant generally continues to have the burden of proving disability at this step, a limited burden of going forward with the evidence shifts to the Social Security Administration.  In order to support a finding that an individual is not disabled at this step, the Social Security Administration is responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that the claimant can do, given the residual functional capacity, age, education, and work experience (20 CFR 404.1512(g) and 404.1560(c)).

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

At the hearing, I asked the representative if the record contained all of the treatment records from all of the providers without redaction from one year prior to the alleged onset date to the present.  The representative responded that he had an MRI that he received from the claimant that morning and had not reviewed the CD to see what was in evidence.  I told the representative to wait a few days to get an updated CD that would include the information he had faxed that morning, then to review it and contact me if any information was missing.  I told the representative that in 30 days I would review the file and if I did not hear from him I would assume the record is complete.  The representative did not contact me to report that the record was not complete or to report any outstanding medical records.  Therefore, I find that the record is complete.

After careful consideration of the entire record, I make the following findings:

**1.    The claimant meets the insured status requirements of the Social Security Act through March 31, 2015.**

**2.    The claimant has not engaged in substantial gainful activity since June 6, 2011, the alleged onset date (20 CFR 404.1571 *et seq.*).**

**3.    The claimant has the following severe impairments: degenerative disc disease and left ankle degenerative joint disease (20 CFR 404.1520(c)).**

As discussed below, the impairments are medically determined, have lasted for longer than twelve months and have caused more than a minimal limitation in the claimant's ability to perform basic work functions.

**4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).**

In making this finding, I considered all of the listed impairments and considered Listing 1.00 (Musculoskeletal System).

The claimant's left ankle degenerative joint disease does not meet or medically equal Listing 1.02A (Major Dysfunction of a Joint) as she retains the ability to ambulate effectively.  The claimant does not require an assistive device to walk and physical examination revealed a normal gait without ataxia (Exhibit 5F/6, 6F/6).

The claimant's degenerative disc disease does not meet or medically equal Listing 1.04 (Disorders of the Spine) as there is no evidence of nerve root compression with atrophy, spinal arachnoiditis or lumbar spinal stenosis.  An MRI of her cervical spine shows degenerative changes most significant at C4-C5 where a posterior disc osteophyte complex impressed up and distorts the ventral aspect of the cord and degenerative narrowing of C5-C6 read by her orthopedic surgeon to not cause spinal cord reformation or compression (Exhibit 5F/3, 6F/3, 8F/6).  The claimant underwent a right L5-S1 microdiskectomy in June of 2011 and subsequent MRIs showed no recurrent disc herniation or nerve root compression (Exhibit 5F/23, 8F/8, 12F/13, 14)

**5.    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except:**
- She can lift and carry 20 pounds occasionally and 10 pounds frequently.
- She can stand or walk for 4 hours in a typical workday.
- She can sit for 4 hours in a typical workday.
- She should be afforded the option to perform work sitting or standing, changing positions at a maximum interval of every 30 minutes.
- She is limited to occasional bending and kneeling.
- She can never stoop, crouch, balance or climb.
- She is limited to simple, routine and repetitive tasks that are not fast paced and only simple work decisions.

In making this finding, I have considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and SSRs 96-4p and 96-7p.  I have also considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and SSRs 96-2p, 96-5p, 96-6p and 06-3p.

In considering the claimant's symptoms, I must follow a two-step process in which it must first be determined whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques--that could reasonably be expected to produce the claimant's pain or other symptoms.

**14**

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, I must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functioning. For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, I must make a finding on the credibility of the statements based on a consideration of the entire case record.

In written reports, the claimant alleged difficulties with lifting, squatting, bending, standing, walking, sitting, kneeling and climbing stairs. She reported that she could walk about 10 to 15 minutes then had to rest 15 to 30 minutes. She also reported that she experiences numbness in her feet and legs and cannot sit for a long time (Exhibit 6E)

The claimant testified that she needs to sit and stand due to numbness from her waist to her knees. She stated that she experiences sciatic pain and recently started Neurontin, but that otherwise her doctor told her to do as much as she can with rest and ice. She testified that she has trouble dealing with the pain on a daily basis. She testified that she can be up and doing things for 10 to 15 minutes at a time before needing to sit and that on a bad day she ices her back two to three times per day for 30 minutes on average. She testified that she uses hot showers, Biofreeze, ice, Ibuprofen and Tramadol to manage her pain and that Ibuprofen causes stomach symptoms (Hearing Testimony).

After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision.

The claimant suffers from degenerative disc disease. She underwent a right L5-S1 microdiskectomy in June of 2011 and initially reported significant improvement in her leg pain (Exhibit 5F/5, 23, 6F/5). However, she subsequently reported back pain and tingling in both legs, left worse than right, in a non-dermatomal pattern without weakness, neck pain radiating into her right shoulder and weakness in her hands (Exhibit 5F/1, 4, 5, 6F/1, 5, 8F/6, 7, 9, 10, 12F/16). Physical examination revealed the ability to stand and ambulate, a normal gait without ataxia, the ability to get on and off the examination table and rise from a supine position without assistance of complaint, full strength of all extremities, no tenderness to palpation of the cervical, thoracic or lumbar spine, no allodynia, intact pulses, generally negative straight leg raises, a good range of motion of her hips and knees, a full range of motion of her shoulders without impingement, no spasm, no edema, intact sensation, no sciatic tension signs, full grip strength bilaterally, intact balance, a full range of motion of her cervical spine other than one finding of a diminished range of motion, unsteady toe walking, an inability to heel walk, an inability to bend or squat, a limited left ankle range of motion with a brace, one finding of decreased sensation to pinprick on the right toe and medial aspect of the dorsal surface of the left foot and one finding of decreased left patellar deep tendon reflex (Exhibit 5F/1, 2, 6, 6F/1, 2, 6, 8F/6, 7, 10, 11F, 12F/16). Lumbar MRIs revealed a disc bulge at L4-L5 with early degenerative spondylolisthesis and scarring at L5-S1 (Exhibit 5F/5, 9, 6F/5, 9, 8F/7, 8). A cervical MRI revealed a posterior

disc osteophyte complex at C4-C5 causing mild to moderate foraminal narrowing and degenerative narrowing of the C5-C6 space without spinal cord reformation or compression (Exhibit 5F/3, 6F/3, 8F/6).  She was prescribed a short courses of Vicodin, Norco and Oxycodone along with Medrol Dosepaks, Neurontin and Ultram and reported "reasonably good relief" (Exhibit 8F/9, 10, 12F/8, 16, 32).  She underwent lumbar epidural steroid injections and was referred to physical therapy for her low back (Exhibit 5F/4, 6, 6F/6, 8F/8, 12F/32).  Her orthopedic surgeon noted that she was not a candidate for surgery for her bulging cervical disc and recommended physical therapy (Exhibit 8F/6, 10).  At her most recent examination, her orthopedic surgeon recommended yoga, but noted that if she did not improve she could possibly benefit from a lumbar fusion (Exhibit 12F/16).  Despite her condition, the claimant testified that she believed she could perform the ticket taker job if she could sit and stand while doing it and she maintains the ability to drive, shop in stores, prepare meals, do laundry and clean for one to four hours daily, indicating that she is less limited than alleged (Hearing Testimony, Exhibit 6E).

The claimant suffers from degenerative joint disease of the left ankle.  In 2010, prior to the alleged onset date, MRIs of the claimant's left ankle showed a non-displaced stress fracture through the body of the talus, anterior ankle synovitis, a tear of the anterior talofibular ligament and distal posterior tibial tendinopathy (Exhibit 1F/3, 5, 2F/2, 4, 3F/5, 6, 18).  She underwent a left ankle arthroscopic debridement for arthritis and synovitis and was subsequently treated with injections and an air cast (Exhibit 3F/14, 22, 26, 27, 5F/37).  By February and March of 2011 she reported that she was feeling better other than occasional pain walking up and down stairs.  Physical examination revealed decreased swelling of the tibialis anterior tendon and pain on palpation of the ball of the tendon, plantar flexion of the foot and plantar flexion of the toes (Exhibit 3F/9).  She underwent an injection of Lidocaine and Celestone and did not return to her provider for treatment for her left ankle from May of 2011 until August of 2012 (Exhibit 3F/8, 9).  At that time, she reported stepping down and hearing a pop.  Physical examination revealed pain on palpation at the second metatarsal with swelling.  18 days later, she was noted to be "doing very good" with 90% resolution of her pain.  Physical examination revealed no swelling or pain with range of motion (Exhibit 3F/7).  She reported that after treatment, her pain diminished considerably and she is able to manage using a left ankle brace (Exhibit 11F).  The claimant's improvement with conservative treatment after her 2010 surgery and her minimal treatment since the alleged onset date shows that she is less limited than alleged.

The claimant's allegations are out of proportion to and inconsistent with the evidence of record.  The claimant's treatment has been conservative since her successful back surgery in June of 2011.  In addition, her surgeon found that she was not a surgical candidate for her cervical spine and has only treated her lumbar spine condition with injections, medications and physical therapy since the 2011 surgery.  His most recent recommendation was to practice yoga (Exhibit 8F/6, 10, 12F/16).  In addition, the claimant initially testified that she would be able to perform the ticket taker job I described at the hearing with the ability to sit and stand, a limitation that was accounted for in her residual functional capacity (Hearing Testimony).  Furthermore, the claimant retains the ability to perform personal care tasks, prepare meals, drive, perform housework, do laundry for two to three hours per day and clean for one to four hours per day, indicating that she is less limited than alleged (Exhibit 11F).

**16**

As for the opinion evidence, Dr. Robert Hoffman opined that the claimant could lift and carry 10 pounds frequently and 20 pounds occasionally, stand and walk for 4 hours and sit for 4 hours in an 8-hour day. He opined that the claimant could never stoop, crouch, balance or climb and could occasionally bend and kneel (Exhibit 11F). I give his opinion significant weight as it is consistent with his examination findings and the medical evidence of record including, the claimant's history of a lumbar microdiskectomy and a left ankle surgery as well as the MRIs showing degenerative changes in her cervical and lumbar spine and the physical examination findings showing a limited range of motion of her left ankle, unsteady toe walking and an inability to heel walk, bend or squat (Exhibit 1F/3, 5, 2F/2, 4, 3F/5, 6, 8, 9, 14, 18, 22, 26, 27, 5F/1, 2, 3, 4, 5, 6, 9, 23, 37, 6F/1, 2, 3, 5, 6, 9, 8F/6, 7, 8, 9, 10, 11F, 12F/8, 16, 32).

David Mance, D.P.M., opined that the claimant was temporarily limited to light duty, regular duty and for a time could only work 4 hours per day 3F/10, 11, 12, 15, 16, 23, 24, 25, 28, 30, 31, 32, 33, 36, 37, 38, 39). I give his opinion little weight, as his restrictions are only temporary during treatment and do not represent long-term functional limitations. In addition, there is no explanation of his definition of light work or support for his restriction that the claimant could only work part-time.

The State Agency medical consultant, Paul Fox, M.D., opined that the claimant was limited to lifting and carrying 20 pounds occasionally and 10 pounds frequently, standing or walking for 3 hours and sitting for about 6 hours in an 8-hour day. He opined that the claimant could occasionally perform postural maneuvers and should avoid concentrated exposure to extreme cold, humidity, vibration and hazards (Exhibit 1A). I give his opinion significant weight, but less than the opinion of Dr. Hoffman. Although his opinion is somewhat consistent with the evidence of record, Dr. Fox only performed a record review unlike Dr. Hoffman who performed a comprehensive physical examination. In addition, Dr. Fox did not have access to all of the medical evidence available at the hearing level. Therefore, I give greater weight to the opinion of Dr. Hoffman (Exhibit 11F).

Considering the medical evidence discussed above, the claimant's activities and the medical opinions, I find that her subjective complaints and alleged limitations are not fully persuasive and that she retains the capacity to perform work activities within the limitations set forth above.

**6.   The claimant is unable to perform any past relevant work (20 CFR 404.1565).**

The claimant has past relevant work as a truck loader, an uncertified nurse's aide and a self-employed title searcher. The truck loading job is heavy and the nurse's aide position is medium to heavy, but the claimant is limited to less than a full range of light work. The title searcher position is skilled, but the claimant is limited to simple, routine and repetitive tasks. Accordingly, the claimant is unable to perform past relevant work.

**7.   The claimant was born on June 2, 1967 and was 44 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).**

**8.   The claimant has a limited education and is able to communicate in English (20 CFR 404.1564).**

**9.   Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).**

**10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).**

In determining whether a successful adjustment to other work can be made, I must consider the claimant's residual functional capacity, age, education, and work experience in conjunction with the Medical-Vocational Guidelines, 20 CFR Part 404, Subpart P, Appendix 2. If the claimant can perform all or substantially all of the exertional demands at a given level of exertion, the medical-vocational rules direct a conclusion of either "disabled" or "not disabled" depending upon the claimant's specific vocational profile (SSR 83-11). When the claimant cannot perform substantially all of the exertional demands of work at a given level of exertion and/or has nonexertional limitations, the medical-vocational rules are used as a framework for decisionmaking unless there is a rule that directs a conclusion of "disabled" without considering the additional exertional and/or nonexertional limitations (SSRs 83-12 and 83-14). If the claimant has solely nonexertional limitations, section 204.00 in the Medical-Vocational Guidelines provides a framework for decisionmaking (SSR 85-15).

If the claimant had the residual functional capacity to perform the full range of light work, a finding of "not disabled" would be directed by Medical-Vocational Rule 202.18. However, the claimant's ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations. To determine the extent to which these limitations erode the unskilled light occupational base, I asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity. The vocational expert testified that given all of these factors the individual would be able to perform the requirements of representative occupations such as:
- Cashier II (D.O.T. #211.462-010), a light, unskilled position with an SVP of 2 and 26,000 jobs in the national economy.
- Photocopying Machine Operator (D.O.T. #207.685-014), a light, unskilled position with an SVP of 2 and 18,000 jobs in the national economy.
- Folding Machine Operator (D.O.T. #208.685-014), a light, unskilled position with an SVP of 2 and 2,900 jobs in the national economy.

The vocational expert testified that his opinion was consistent with the Dictionary of Occupational Titles other than the sit stand option which is not addressed by the publication. He stated that his opinion is based upon his observation of the jobs and the observation of other vocational experts in the field. Pursuant to SSR 00-4p, I have determined that the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles other than the sit stand option and I accept the vocational expert's testimony regarding this difference based on his professional expertise.

Based on the testimony of the vocational expert, I conclude that, considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy. A finding of "not disabled" is therefore appropriate under the framework of the above-cited rule.

**11.  The claimant has not been under a disability, as defined in the Social Security Act, from June 6, 2011, through the date of this decision (20 CFR 404.1520(g)).**

### DECISION

Based on the application for a period of disability and disability insurance benefits protectively filed on March 20, 2013, the claimant is not disabled under sections 216(i) and 223(d) of the Social Security Act.



/s/ *John J. Porter*
——————————————————————
John J. Porter
Administrative Law Judge


January 29, 2015
——————————————————————
Date

# LIST OF EXHIBITS

## Payment Documents/Decisions

| Component No. | Description | Received | Dates | Pages |
|---|---|---|---|---|
| HO 1A | Disability Determination Explanation - Title II - Physical RFC Paul Fox, MD | | 07/09/2013 | 10 |
| HO 2A | Disability Determination Transmittal - Title II - PTTYPE - 7160/7240 | | 07/09/2013 | 1 |

## Jurisdictional Documents/Notices

| Component No. | Description | Received | Dates | Pages |
|---|---|---|---|---|
| HO 1B | Personal Decision Notice - Title II Notice of Disapproved Claim | | 07/10/2013 | 5 |
| HO 2B | Request for Hearing by ALJ | | 09/16/2013 | 2 |
| HO 3B | Appointment of Representative - Lawrence E Bolind, Jr., Esquire | | 09/16/2013 | 1 |
| HO 4B | Request For Hearing Acknowledgement Letter | | 04/02/2014 | 10 |
| HO 5B | Outgoing ODAR Correspondence - Letter to REP w/ Questionnaires/Barcodes | | 03/29/2014 | 11 |
| HO 6B | Hearing Notice | | 09/30/2014 | 26 |
| HO 7B | Acknowledge Notice of Hearing/Will be present | | 09/30/2014 | 2 |
| HO 8B | Resume of Vocational Expert Samuel E. Edelmann, M.Ed. | | 11/14/2014 | 2 |
| HO 9B | Notice Of Hearing Reminder | | 11/19/2014 | 6 |

## Non-Disability Development

Trish Ann Fontana (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)                                      Page 2 of 4

| Component No. | Description | Received | Dates | Pages |
|---|---|---|---|---|
| HO 1D | New Hire, Quarter Wage, Unemployment Query (NDNH) | | 03/29/2014 | 2 |
| HO 2D | Certified Earnings Records - ICERS - DLI: 3/31/2015 | | 03/29/2014 | 2 |
| HO 3D | Summary Earnings Query | | 03/29/2014 | 1 |
| HO 4D | Detailed Earnings Query | | 03/29/2014 | 4 |
| HO 5D | Certified Earnings Records | | 10/27/2014 | 3 |

### Disability Related Development

| Component No. | Description | Received | Source | Dates | Pages |
|---|---|---|---|---|---|
| HO 1E | Disability Report - Field Office | | Interviewer | to 04/18/2013 | 3 |
| HO 2E | Disability Report - Adult | | | to 04/18/2013 | 8 |
| HO 3E | Work History Report | | | to 04/18/2013 | 10 |
| HO 4E | DDS Disability Worksheet | | | to 04/19/2013 | 6 |
| HO 5E | Work History Report | | Claimant | to 04/24/2013 | 11 |
| HO 6E | Function Report - Adult - w/ Supplemental Function Questionnaire | | Claimant | to 04/30/2013 | 11 |
| HO 7E | Copy of Case Development Claimant Correspondence | | Claimant | to 05/29/2013 | 4 |
| HO 8E | Disability Report - Field Office | | | to 09/16/2013 | 2 |
| HO 9E | Disability Report - Appeals | | | to 09/16/2013 | 6 |

Trish Ann Fontana (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)                                      Page 3 of 4

| | | | | |
|---|---|---|---|---|
| HO 10E | Report of Contact | | DO #A34 | 1 |
| | | | to | |
| | | | 11/13/2013 | |

## Medical Records

| Component No. | Description | Received | Source | Dates | Pages |
|---|---|---|---|---|---|
| HO 1F | Radiology Report | | JRMC Diagnostic Services | 03/08/2010 to 10/29/2010 | 7 |
| HO 2F | Office Treatment Records | | JRMC Diagnostic Services Brentwood-David Mance, DPM | 03/08/2010 to 10/29/2010 | 6 |
| HO 3F | Office Treatment Records | | David J. Mance, DPM-JRMC Diagnostic Services Brentwood | 01/18/2010 to 03/24/2011 | 45 |
| HO 4F | Physical/Occupational Therapy Records | | Jefferson Regional Medical Center | 10/27/2011 to 11/07/2011 | 7 |
| HO 5F | Emergency Department Records | | UPMC Mercy at South Side Outpatient Center | 04/07/2010 to 04/17/2013 | 40 |
| HO 6F | Emergency Department Records | | UPMC MERCY | 11/12/2011 to 04/17/2013 | 10 |
| HO 7F | Unsuccessful Development Attempt to Secure Medical-There are No Dates of Service | | WEIDNER, GREGG | to 04/23/2013 | 6 |
| HO 8F | Office Treatment Records | | Jory D. Richman, MD | 06/27/2011 to 04/24/2013 | 11 |
| HO 9F | Unsuccessful Development Attempt to Secure Medical-There are No Dates of Service | | WEIDNER, GREGG G | to 05/15/2013 | 6 |
| HO 10F | CE Acknowledgement | | AMCE PHYSICIANS GROUP | to 06/11/2013 | 2 |

Trish Ann Fontana (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)                                    Page 4 of 4

| HO 11F | Consultative Examination Report | Robert Hoffman, MD | to 06/11/2013 | 7 |
| HO 12F | Outpatient Hospital Records | UPMC Mercy | 04/22/2014 to 10/15/2014 | 40 |

 INSERT THIS END FIRST 

**Client Name:** Trish Ann Fontana

**Document Description:** Claimant-supplied Evidence

**Form Name:** CLMTEVID

**Printed by:** R. Beltrame



RQID:BD475796895              SITE:A34 DR:S
SSN:197563849 DOCTYPE:0180 RF:  CS:2193

| Request ID: | BD475796895 |
|---|---|
| Site ID: | A34 |
| SSN: | 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 |
| Document Type: | 0180 |

**Form Specific Information:**

Note: additional medical evidence

**24**

412-232-4040

Page 1 of 1

Fontana, Trish A DOB: 06/02/1967

**UPP ORTHO MERCY GREENTREE**
969 Greentree Road
Pittsburgh PA 15220-3328
Ph: 412-232-5800    Fax: 412-232-7351

Date: 10/10/2016
Name: Trish A Fontana
Address: 3130 GLENDALE AVE
PITTSBURGH, PA  15227
H: 412-770-4440
DOB: 06/02/1967
Gender: Female

## CONSULT / REFERRAL TO PAIN CLINIC
Referral

Date: **10/10/2016**
Department: **UPP ORTHO MERCY
GREENTREE**

### Associated Diagnoses

Lumbar radiculopathy [M54.16] - Primary

| Priority | CPT | Quantity |
|---|---|---|
| Routine | 9049 | 1 |

### Order Questions

| Question | Answer | Comment |
|---|---|---|
| Referral Reason | LLE radiculopathy, ESIs | |

### Referred To Information

| Dept Specialty |
|---|
| Pain Management |

### Comments

Dr. Trivedi
412-232-4040
Office note in system

**Electronically Signed by:**
Richman, Jory D, MD
Oct 10, 2016 at 3:13 PM

Lic#: MD046590L

NPI#: 1740265065

Allergies Reviewed On: **10/10/2016** By: Lutz, Colleen N

Allergies as of 10/10/2016

| | Severity | Noted | Reaction Type | Reactions |
|---|---|---|---|---|
| Adhesive Tape | | | Topical | Rash, Hives |
| Morphine | | 06/12/2012 | Side Effect | Nausea & Vomiting |
| Pcn [Penicillin G Benzathin,procain] | | 06/12/2012 | Topical | Hives |
| Seasonal [Environmental Allergens] | | 12/21/2015 | | |

*Appt. Scheduled:*
*Dr. Chu 13 2016*
*Dec. 13 8:30 AM*

Fontana, Trish A DOB: 06/02/1967

# My UPMC

| Name | Sex | DOB | PCP | Clinic |
|------|-----|-----|-----|--------|
| Trish A Fontana | Female | 06/02/1967 | FADY S RIAD, MD | Wh Gpob |

# MR LUMBAR SPINE WITH AND WITHOUT CONTRAST

If you have questions or concerns about your test results, you can send a message to the doctor who ordered the test. **Send a message** to the doctor who ordered the test and get the answers you need.

Collected:**09/15/2016**

Resulted:**09/15/2016**

Ordered By:**Jory D Richman, MD**

Result Status:**Final result**

## Narrative

CLINICAL HISTORY: low back pain with pain into right leg. previous hx of spinal fusion.; + slr producing pain. + pain with forward bend decreased  pain with; Pain, unspecified  COMPARISON: Radiographs 09/12/2016. TECHNIQUE: Sagittal T1-T2, STIR, axial T1-T2, axial and sagittal T1 postcontrast  imaging of the lumbar spine.  The patient was administered 16 cc of IV MultiHance . FINDINGS: Vertebral body heights are preserved. There is grade 1  anterolisthesis of L4 on L5. Posterior decompression is seen at L4-L5  with transpedicular screws at L4 and L5.  The terminal nerve roots are unremarkable without evidence of  clumping. Minimal discogenic marrow changes are seen at the anterior  aspect of L5-S1. L1-L2: Mild diffuse disc bulge with minimal narrowing of the canal.  The neural foramen are patent. L2-L3: Mild diffuse disc bulge with only minimal narrowing of the  canal or neural foramen. L3-L4: Mild diffuse disc bulge and facet arthrosis are seen. There is  no significant narrowing of the canal or **26**

neural foramen. At L4-L5 there has been posterior decompression. Facet arthrosis is seen. Mild narrowing of subarticular recesses are noted due to the change in alignment. The neural foramen demonstrate mild narrowing bilaterally. L5-S1: Mild diffuse disc bulge extending preferentially towards the left. The canal is patent. The left neural foramen demonstrates moderate to severe narrowing and the right neural foramen demonstrates only minimal narrowing. There is no paraspinal soft tissue abnormality. Epidural fat appears normal. No abnormal osseous enhancement or intramedullary enhancement. No intrathecal enhancement is noted.

## Impression

Grade 1 anterolisthesis which is fused at L4-L5. At this level mild narrowing of subarticular recesses are noted due to change in alignment. Disc material extending eccentrically towards the left as a bulge appears to contact the exiting left L5 nerve causing moderate to severe narrowing of the left neural foramen.

**27**

Please ADD these
PAPERS to my CLAIM.

Thank you

Trish A. Fontana
3130 Glendale Ave.
Pgh PA 15227
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

**28**

 INSERT THIS END FIRST 

**Client Name:** Trish Ann Fontana

**Document Description:** Claimant-supplied Evidence

**Form Name:** CLMTEVID

**Printed by:** K. Teal



RQID:BD463524404            SITE:A34 DR:S
SSN:197563849 DOCTYPE:0180 RF:  CS:d7d5

| Request ID: | BD463524404 |
|---|---|
| Site ID: | A34 |
| SSN: | 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 |
| Document Type: | 0180 |

**Form Specific Information:**

**29**

Fontana, Trish A                                          Encounter Date: 12/21/2015

## Department

| Name | Address | Phone | Fax |
|------|---------|-------|-----|
| UPP General Internal Medicine - Oakland | UPMC Montefiore, 9 South 3459 Fifth Ave. Pittsburgh PA 15213-3236 | 412-692-4888 | 412-692-4892 |

## After Visit Summary
**12/21/2015**                                          **Trish A Fontana**

## Visit and Patient Information

### Your Information

| Gender | DOB | Age | Race | Ethnicity | Language |
|--------|-----|-----|------|-----------|----------|
| Female | Jun 2, 1967 | 48 year old | White | Not Hispanic or Latino | English |

### Visit Information

| | Provider | Location |
|--|----------|----------|
| 12/21/2015 9:15 AM | FADY S RIAD | General Internal Medicine - Oakland |

### Chief Complaint/Symptoms

| | |
|--|--|
| Initial Visit | |
| Establish Care | |
| Hospital F/U | |
| Medication Evaluation | |
| blood work | |
| Stroke | mild |
| Hematoma | |
| Aneurysm | |

### Today's Diagnosis

| | |
|--|--|
| Encounter for general adult medical examination with abnormal findings   - Primary | Z00.01 |
| Long term current use of anticoagulant therapy | Z79.01 |
| Cerebral infarction due to unspecified mechanism(Notable Code) | I63.9 |
| Screening for breast cancer | Z12.39 |

### Vitals

| BP | Pulse | Ht | Wt | LMP |
|----|-------|----|----|-----|
| 138/89 mmHg | 94 | 5' 3" (1.6 m) | 165 lb (74.844 kg) | 11/16/2015 |

### BMI Data

| Body Mass Index | Body Surface Area |
|-----------------|-------------------|
| 29.24 (kg/m^2) | 1.78 (m^2) |

### Your Orders Placed Today

Normal Orders This Visit
**CONSULT / REFERRAL FOR RECORD REQUEST**
CONSULT / REFERRAL TO PHARMACY MANAGEMENT
MAMMOGRAM DIGITAL SCREENING W/ CAD
PROTHROMBIN TIME/INR

**We are giving you a list of all of the medications that you have told us you are taking as well as the medications we have prescribed for you today. Please review the list. If it is different from your list, or if you have any questions, please contact the doctor who ordered the medication or your primary care**

SS# 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

**Fontana, Trish A**                                                    Encounter Date: 06/16/2016

**Department**

| Name | Address | Phone | Fax |
|------|---------|-------|-----|
| UPP General Internal Medicine - Oakland | UPMC Montefiore, 9 South 3459 Fifth Ave. Pittsburgh PA 15213-3236 | 412-692-4888 | 412-692-4892 |

## After Visit Summary
### 6/16/2016                                                              Trish A Fontana

## Visit and Patient Information

### Your Information

| Gender | DOB | Age | Race | Ethnicity | Language |
|--------|-----|-----|------|-----------|----------|
| Female | Jun 2, 1967 | 49 year old | White | Not Hispanic or Latino | English |

### Visit Information

|  | Provider | Location |
|--|----------|----------|
| 6/16/2016 10:15 AM | ABHIK BHATTACHARYA | General Internal Medicine - Oakland |

### Chief Complaint/Symptoms
**Anxiety**

### Today's Diagnosis

|  |  | Codes | Comments |
|--|--|-------|----------|
| **PTSD (post-traumatic stress disorder)** | - Primary | F43.10 | |
| **Situational anxiety** | | F41.8 | |
| **Panic attacks** | | F41.0 | |

### Follow-Up

Disposition
Return in about 1 day (around 6/17/2016).

### Vitals

| BP | Pulse | Ht | Wt |
|----|-------|-----|-----|
| 133/87 | 101 | 5' 2.25" (1.581 m) | 189 lb (85.7 kg) |

### BMI Data

| Body Mass Index | Body Surface Area |
|-----------------|-------------------|
| 34.29 (kg/m^2) | 1.87 (m^2) |

### Your Orders Placed Today

Normal Orders This Visit
**CONSULT / REFERRAL TO PSYCHIATRY**

We are giving you a list of all of the medications that you have told us you are taking as well as the medications we have prescribed for you today. Please review the list. If it is different from your list, or if you have any questions, please contact the doctor who ordered the medication or your primary care provider.

### Outpatient Medication List as of 6/16/2016

|  | Instructions |
|--|--------------|
| escitalopram oxalate (LEXAPRO) 20 mg oral tablet | Take 1 tablet by mouth daily |
| LORazepam (ATIVAN) 0.5 mg oral tablet | Take 0.5 tablets by mouth every 8 hours as needed for anxiety |

**31**

SS# 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

Fontana, Trish A                                              Encounter Date: 06/16/2016

**We are giving you a list of all of the medications that you have told us you are taking as well as the medications we have prescribed for you today. Please review the list. If it is different from your list, or if you have any questions, please contact the doctor who ordered the medication or your primary care provider. (continued)**

### Outpatient Medication List as of 6/16/2016 (continued)

|  | Instructions |
|---|---|
| **aspirin EC 81 mg oral delayed-release tablet** | Take 81 mg by mouth daily |
| **atorvastatin (LIPITOR) 10 mg oral tablet** | Take 1 tablet by mouth daily |
| **ferrous sulfate 325 mg (65 mg iron) oral tablet** | Take 1 tablet by mouth 2 times a day |
| **loratadine (CLARITIN) 10 mg oral tablet** | Take 10 mg by mouth daily |
| **nicotine (NICODERM CQ) 7 mg/24 hr TD transdermal patch** | Place 1 Patch onto the skin daily for 30 days |
| **omeprazole (PRILOSEC) 20 mg oral delayed-release capsule** | as needed |
| **warfarin (COUMADIN) 5 mg oral tablet** | Take 1 &1/2 tab (7.5mg) daily except take 1 tab mon/fri or as directed |

### Medications Ordered Today

|  | Disp | Refills | Start | End |
|---|---|---|---|---|
| **escitalopram oxalate (LEXAPRO) 20 mg oral tablet** | 90 tablet | 3 | 6/16/2016 | |
| Take 1 tablet by mouth daily - oral | | | | |
| Pharmacy: GIANT EAGLE #2408 - PITTSBURGH, PA - 600 | | | | |
| TOWNE SQUARE WAY Ph #: 412-881-5120 | | | | |
| **LORazepam (ATIVAN) 0.5 mg oral tablet** | 10 tablet | 0 | 6/16/2016 | |
| Take 0.5 tablets by mouth every 8 hours as needed for anxiety - oral | | | | |
| Notes to Pharmacy: Take one 1/2 tablet when you feel really anxious. | | | | |

### Allergies

#### Your Allergies as of 6/16/2016

|  | Noted | Type | Reactions |
|---|---|---|---|
| **Adhesive Tape** | | Topical | Rash, Hives |
| **Morphine** | 6/12/2012 | Side Effect | Nausea & Vomiting |
| **Pcn (Penicillin G Benzathin,Procain)** | 6/12/2012 | Topical | Hives |
| **Seasonal (Environmental Allergens)** | 12/21/2015 | | |

### Your Tobacco History

| Category | History |
|---|---|
| **Smoking Tobacco Use** | **Current Every Day Smoker; Start date: ; 0.25 packs/day for 25 years (6.25 pk yrs); Types: Cigarettes** |
| **Smokeless Tobacco Use** | **Never Used** |

### MyUPMC

Did you know that as a MyUPMC member, you have the ability to view test results, renew prescriptions, message your doctor's office, and manage and schedule appointments online? To access these features, visit **MyUPMC.com** to login to your account. As a MyUPMC member, you can access these features from your mobile device by downloading the **MyChart** app from your app store (for Android or iPhone/iOS based devices). Just choose **MyUPMC** as your health care service.



University of Pittsburgh
Physicians, Department of
Orthopaedic Surgery

Freddie H. Fu, MD
Chairman

Lisa R. Blackrick, MD
Andrew R. Evans, MD
Jory D. Richman, MD
Mitchell H. Rothenberg, MD

UPMC Mercy
1350 Locust Street
Suite 220
Pittsburgh, PA 15219
T 412-232-5800
F 412-232-7351

UPMC Brentwood Ortho Mercy
4190 Brownsville Road
Pittsburgh, PA 15227

UPMC Green Tree Ortho Mercy
969 Greentree Road
Second Floor
Green Tree, PA 15220

UPMC West Mifflin Ortho Mercy
1907 Lebanon Church Road
Suite 201
West Mifflin, PA 15122

June 9, 2015

Re: Trish A Fontana
Date of Birth: 6/2/1967

To Whom It May Concern:

Ms. Fontana will be having surgery on June 30, 2015 at Mercy Hospital for a
Lumbar Decompression and Fusion L4-5.

If you have any questions please do not hesitate to contact me.

Sincerely,

Jory D Richman, MD

This document has been electronically signed.

**33**

SOCIAL SECURITY ADMINISTRATION
OFFICE OF DISABILITY ADJUDICATION AND REVIEW

**TRANSCRIPT**

In the case of                    Claim for

Trish Ann Fontana
_____           _____

(Claimant)
                                  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
_____           _____

(Wage Earner) (Leave blank         (Social Security Number)
in Title XVI Cases or if
name is same as above)

**Hearing Held**

at

Pittsburgh, Pennsylvania
_____

(Room No., Building, Street Address, City, State)

on

December 3, 2014
_____

(Month, Day, Year)

by

John J. Porter
_____

(Administrative Law Judge)

**APPEARANCES:**   Trish Ann Fontana, the Claimant
                   Mr. Bowen, Attorney for Claimant
                   Samuel Edelman, Vocational Expert

Pages:     1 through 25

**34**

INDEX OF TRANSCRIPT

In the case of:                                    Account Number

Trish Ann Fontana, Claimant                         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


                                                              Page

Testimony of Trish Ann Fontana        commencing              6

Testimony of Samuel Edelman           commencing              20

**35**

(The following is a transcript in the hearing held before John J. Porter, Administrative Law Judge, Office of Disability Adjudication and Review, Social Security Administration, on December 3, 2014, at Pittsburgh, Pennsylvania, in the case of Trish Ann Fontana, Social Security Number 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.  The Claimant appeared in person and was represented by Mr. Bowen, Attorney.  Also present was Samuel Edelman, Vocational Expert.)

(The hearing commenced on December 3, 2014.)

OPENING STATEMENT BY ADMINISTRATIVE LAW JUDGE:

ALJ:  We're ready to proceed with the hearing for Trish Fontana, Social Security number 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.

CLMT:  Yes.

ALJ:  Good morning, ma'am.  I'm Judge Porter with the Office of Disability Adjudication and Review.

CLMT:  Good morning.

ALJ:  I'm separate from the people who denied your claim for benefits.  I'm not bound by that decision.  I'm going to make a new decision based on the evidence that's in the record.

CLMT:  Okay.

ALJ:  What I'm trying to do, ma'am, is get your description of the symptoms you are experiencing and how they affect your ability to do work related activities like sit, stand, walk, lift, carry, push, pull, concentrate on your work, interact with other people, follow your supervisor's directions.  I'm going to ask you some questions to try to understand that.  And you don't need to try to explain the medical cause or diagnosis.  I get that from reading the medical records, which I do carefully.  What you can tell me about, though, is how this actually affects you in your functional abilities.  We focus on your functional abilities in the Social Security hearing.  Now,

**36**

ma'am, the best thing you can do for your case is to answer my
questions factually and truthfully.  I get the impression that a few
of the people who come into my hearing seem to feel the need to
describe themselves as basically totally non-functional.  They can't
do anything anytime, anywhere.  If you describe yourself that way but
the medical evidence doesn't support that, that would raise a question
about the credibility of your statements.  And my assessment of the
credibility of your statements is an important part of your case.  So
you don't need to exaggerate, that doesn't help.  Now, you don't need
to hold anything back either.  You can fully explain your symptoms and
how they affect your ability to do work related activities.  All
right, Mr. Bowen (PHONETIC) the evidence I see in the electronic
folder consists of 1A through 11F.  Do have any objection to admitting
those into evidence?

    ATTY:  I'm sorry, A through --

    ALJ:  1A through 11F.

    ATTY:  -- 11F.  Okay.  I'm not sure, I numbered mine differently
and I have seven, really eight exhibits.  So I'm not sure if they're
duplicate or not.

    (Exhibits 1A through 11F, previously identified, were received
into evidence and made a part of the record thereof.)

    ALJ:  All right.  Well what you can do is, they usually give you
a disc when you come.  You can look at that and see how we've --

    ATTY:  Okay.

    ALJ:  -- numbered the exhibits.  Or we have a system called
electronic records express.  It's --

    ATTY:  Right.

**37**

ALJ:  -- internet based.  You sign up for it and you can have real time access to the file and see just what's in there.  But it's important for you to do that because I want to make sure --

ATTY:  Right.

ALJ:  -- I have all the records that we need to decide the case.

ATTY:  If we could do it this way, Your Honor, if we can say yes and add eight more to yours and then if it is duplicate, everything's included then.

ALJ:  Okay.  Now we did receive a submission by you on December 3rd --

ATTY:  Yes.

ALJ:  -- 2014.  That, in fact, that's the only thing that's been --

ATTY:  Yeah.

ALJ:  -- submitted since June of 2013.

ATTY:  Okay.

ALJ:  So that must be what you submitted.

ATTY:  Correct, Your Honor.

ALJ:  Now, here's the --

ATTY:  And then with the exception of an MRI that Mrs. Fontana gave me this morning --

CLMT:  Yes.

ALJ:  Mm-hmm.

ATTY:  -- and that was an August 2014 MRI obtained from UPMC Mercy, Dr. Richman.

ALJ:  Right, okay.  Well you'll need to submit --

**38**

ATTY:  Okay.

ALJ:  -- that.  Now here's the thing, Mr. Bowen.

ATTY:  Yes, sir.

ALJ:  I'm looking at what you submitted here on December --

ATTY:  This morning.

ALJ:  This morning?  Let's see.  Yeah, the third, yeah.  And here's the problem with it.  You lumped a whole bunch of things together and what our procedure is and what we explained to you is that there should be one barcode for one provider, another barcode, another provider.  And --

ATTY:  Okay.

ALJ:  -- I mean you included a bunch of things like the notice of hearing, your waiver of your --

ATTY:  The fee waiver.

ALJ:  -- direct payment of the fee.  I mean, I don't know why you're submitting the notice of hearing.  But it looks like someone put a bunch of stuff together and faxed it to us.

ATTY:  That was me.

ALJ:  Right.

ATTY:  Okay.

ALJ:  Well, that's not --

ATTY:  I'm showing my ignorance of the procedure --

CLMT:  Okay.

ATTY:  -- and I apologize for that.

ALJ:  Okay well the procedure is explained to you in several letters we sent to you.

**39**

ATTY:  Okay.

ALJ:  And when you do it this way, you create a whole lot more work for our staff, you slow things down --

ATTY:  Okay.

ALJ:  -- the procedure is for you to get a barcode for your client and one set of records, Dr. Richman's records, Mercy Hospital, each provider, submit those separately --

ATTY:  Okay.

ALJ:  -- in chronological order without duplicates.

ATTY:  Okay.

ALJ:  That's the preferred practice.  That helps us move these cases along faster.  People are waiting too long for their hearing.

CLMT:  That's my fault for sending that stuff to you.

ALJ:  That's part of the problem.  So you'll need to learn how to do that.  And so that, so that I know that we have all the treatment records, what you'll have to do after this, after the hearing in a few days, get a disc, call here ask for a disc, get it, check and see if then we do have all the treatment, we need all the treatment records from all the providers without anything being redacted from one year prior to the application date to as current as possible.  Now, you know, we can't expect records a few days ago.  But as close to the hearing as possible.

ATTY:  This morning I did receive from the lady at the desk what I assume to be all the exhibits that's going to be presented today. So I do have a disc.

ALJ:  Right, you do --

ATTY:  Okay.

ALJ:  -- but that disc now does not reflect what you submitted this morning.

ATTY:  Okay.

ALJ:  And so what you submit this morning will be given an exhibit and put onto, going to be put onto a disc in a few days.  So a week from now, ask for a disc, get it, review it, and then send me a letter saying yes, Judge, we do have all the medical records or no Judge, this is what's missing.

ATTY:  Yes, sir.

ALJ:  If there's something missing, my procedure is to give you 30 days to try to get it.  So let me know one way or another but I need to make sure I have all the evidence --

ATTY:  Yes, sir.

ALJ:  -- so I can decide this case properly.  All right, ma'am, you'll be under a legal obligation to tell the truth as will Mr. Edelman who's seated to your left there.  He's a Vocational Expert.  The Social Security Administration pays him for his time but he doesn't decide your case.  That's my responsibility.

(The Claimant, TRISH ANN FONTANA, having been first duly sworn, testified as follows:)

EXAMINATION OF CLAIMANT BY ADMINISTRATIVE LAW JUDGE:

Q  All right, ma'am, would you tell us your full name?

A  Trish, excuse me, Trish Ann Fontana.

Q  And Ms. Fontana, what is your current address?

A  3130 Glendale Avenue, Pittsburgh, Pennsylvania 15227.

Q  Is that the address where you received the letter about

**41**

today's hearing?

    A   Yes.

    Q   And what is your date of birth?

    A   June 2, 1967.

    Q   And how old are you today?

    A   Forty-seven.

    Q   And what is the highest level of education you've achieved?

    A   Ninth grade, tenth grade.

    Q   Did you ever get your GED?

    A   No.

    Q   All right.  You filed an application with Social Security and you said you've not been able to work since June of 2011.

    A   Yes.

    Q   Now from June of 2011 till now, have you had some kind of medical insurance or a medical assistant card so that you could have all the treatment you need paid for?

    A   No.

    Q   All right.  Do you have insurance now?

    A   No.

    Q   Have you had insurance at any time throughout this time period?

    A   No, I've just been doing payments.  I applied for insurance and with the issue it tells me I need to apply for, I'm sorry I need to apply for Social Security Disability.

    Q   All right.  But it seems like you've seen Dr. Richman --

    A   Richman, yes.

**42**

Q -- and he's done surgery on your back.  And he has provided you with some treatment these past couple years.

A  Right.

Q  How did you manage to pay for that?

A  Payments were through Mercy Healthcare, Mercy, they'll give you, you go through and apply for, it's like a, for the income, they go by your income.  And which, you know, is my husband and you make payments.

Q  Okay.  So but considering all that, did you get the treatment you need or did you, do you think you didn't get some treatment because of financial issues?

A  At first, the surgery, I did.  And there was some ordered myelograms which I couldn't have done because no insurance --

Q  Mm-hmm.

A  -- and they said they were pretty pricey and so I'd just been dealing with different medications, trying to help.

Q  Now it looks like you did get some MRIs --

A  Yes, yes he did order those.  And he sent down and ordered those, but that was, he said less than the myelogram injection and that was, you know, to see exactly what was going on in the spine.

Q  Okay.  Now have you gotten the physical therapy you need?

A  I did for my back just recent.  I did not, I had to wait for a claim number which I just got on this past Friday for the physical therapy to do, it was due to a car accident on October 24th.

Q  Okay.  But back over the past couple years, it looks like the doctor wanted you to do physical therapy.

**43**

A   Sorry.  Yes.

Q   And did you get to do that?

A   I got to do two weeks of therapy and then I pulled sciatic in my left leg and he had stopped it because of, he said it was too, it was too painful.

Q   Okay.  All right.  Now have you engaged in any kind of work activity?  A part-time job, and under the table job, odd job, any work at all since June of 2011?

A   No.

Q   Okay.  Where's the last job that you actually went in and did some work?

A   OK Grocery.

Q   And what's the last day you worked there?

A   Pretty sure January 2010.

Q   All right.  And how did that job come to an end?  Did they tell you you had to stop working there or did you decide to stop working there?

A   I had my, I had hurt my foot, I pullled Achilles tendon.  I was in a boot, in and out of a boot and they told me they could employ me with limitations because I had the boot on.  So they let me go.

Q   Did you get hurt on the job?

A   Well I twisted my, hit my ankle going into the truck.  It was like a week, or three days before and I didn't think anything of it. I was walking, had a little limp --

Q   Mm-hmm.

A   -- thought I just twisted an ankle.  That was a Wednesday.  I

**44**

worked Saturday, Sunday, 12 hour days and it was just really bothering
me Monday morning.  Called my foot doctor, Dr. Mance.

    Q  Did you make a worker's compensation claim?

    A  No.

    Q  You never made one --

    A  No.  I did not.

    Q  All right.  Now, so I can understand how your impairments
affect your ability to do work activities, I'm going to describe a job
to you.  Your job would be to be a ticket taker at a movie theater.
And your job would be to sit there and take tickets from people or
stand up and take tickets from people.  And you'd be allowed to do
that sitting or standing and you could change position if you'd like.
Now, you'd have to do that eight hours a day, five days a week, do it
full-time, interact with the customers, follow your supervisor's
directions, do a good day's work.  Do you think you'd be able to do
that type of job since June of 2011?

    A  I have to sit, stand, and I have severe pain in my legs, feet.
I have a lot of nerve issues right now.

    Q  All right, so ma'am, as I said, I need to focus in on your
functional abilities.  And, you know, if there's nerve damage or what
the MRIs show, that kind of stuff, I'll get that from the medical
records.

    A  Okay.

    Q  But I asked you a very practical question --

    A  Yeah, to think I could deal with --

    Q  -- for a reason --

**45**

A  -- sitting and standing --

Q  -- so I, pardon me?

A  I'm sorry, go ahead.

Q  So, you know, I look at, you know, from your view point, I need you to talk very practically about what you can and what you can't do and what your symptoms are.  So do you think you'd be able to go in full-time and do a job where you're allow to sit or stand like being a ticket taker at a movie theater?

A  Yes, if I was allowed to do sit or stand because that's what I need to do, sit and then stand.

Q  Okay.  And what is the pattern that you need to follow, sitting or standing?

A  Well the pattern I sit and I stand for a while because I have numbness from my waist to my knees --

Q  Mm-hmm.

A  -- and then, you know, if they'd allow me that, then I'm not afraid to try.

Q  All right.  Well I'm trying to get some idea of like what kind of pattern you'd have to follow like, Judge, I'd have to sit for an hour and then stand for an hour or I'd have to sit for ten minutes and sit.  What pattern do you need to follow, just like think of your day to day activities.

A  Okay.

Q  The eight hours you'd be working.  What pattern do you follow in terms of your sitting and standing or whatever through eight hours of the daylight hours that you might be working.

**46**

A   Okay.  I do something, I sit down ten to fifteen minutes.  I get back up, you know, until I start like hurting really bad.  And then I sit down, and then stand.  That's about for (INAUDIBLE).

Q   Okay.  All right.  Now who do you live with?

A   My husband and ten year old daughter.

Q   And does your husband work outside the home?

A   Yes.

Q   And there are things we need to do, we call them activities of daily of living, cooking, cleaning, laundry, repairing things that break, keeping track of money, paying bills, going to the grocery store, looking after a ten year old, you know there are all these things we need to do to keep our lives going.  How much of that stuff can you accomplish in a typical week?  Give me some idea of what you can get done.

A   I can go to the grocery store with help normally.  You know, I don't lift anything extremely heavy because of my injury and I'm trying to do whatever I can.  You know, I just don't sit and say oh, I can't do that.  I try and --

Q   But I'm trying to get an idea --

A   Sorry.

Q   -- again, how much you actually get done.  How much, how much are you able to accomplish of those things?

A   Okay.  I do laundry.  I go to the grocery store, I do the bills.  I can't do any activities with my daughter in school.  You know, she has some things and I'll go and the majority of the time I just, you know, I'm a bystander now because I can't join in, join in

**47**

to things.  I used to go on field trips and things with her, I can't do that.

Q  Okay.  Now would you describe the symptoms?  What's it like? What are you feeling in your mind or body day to day?

A  I'm miserable.  I can't, I can't, some days I'm like I can't deal with this anymore.  You know, and I've tried medications and, you know, without major pain medications that I, you know, I have Neurontin's a new medicine that's supposed to help control the nerves. And you know, I have some relief but it's not gone.  And I just, some days I tell my husband I just want to quit myself.  I can't, I can't deal with the pain like this.  I don't, I just, I can't.  And then --

Q  All right.  Now, it looks like you just recently got on Neurontin.

A  Yes.  I was on that once before from Doctor (INAUDIBLE) was the nerve blocks.  And it didn't, it didn't --

Q  I'm sorry --

A  It's okay.

Q  Sorry about that.

A  It's okay.

Q  You were saying that you were on Neurontin before --

A  Yes.

Q  -- and before did it help at all?

A  I had some relief from it, I did.  And then the pain, the sciatic pain got really bad, shooting down my legs really bad to my feet, feels like I'm walking on nails.  And then I'm back to Dr. Richman and just back and forth and then, you know, he tells me I

**48**

14

can grin and bear it, you know, and try and do as much as I can with rest.  You know, I need to rest more.  He said maybe ice it.  The pain, it's just like jolting sciatic pain.

Q  Mm-hmm.  Okay.  So you're going about, you're trying to go about your day.  Take care of your house, your children, whatever you do.  And you mentioned that you need your rest.  What's that pattern of what kind of resting you need to do?

A  What kind of, how I do it?

Q  Yeah --

A  Okay.

Q  -- how often do you need to, you know, actually stop what you're doing and rest?

A  Okay.  That's usually ten, fifteen, twenty minutes when I'm up doing stuff.  I'm up on my feet and I'll start getting the pain shoot down my legs and into my feet.  And I go and I sit down or lay down.  I'll usually use an ice pack or a heating pad.

Q  Can you give me some idea of usually?  Well, you probably have bad days and not so bad days.

A  Yeah.

Q  Well let's talk about the bad days.  On a bad day during the eight hours of day time, how often do you need to do something like lay down and put ice on your back or something like that?

A  At least two to three times.

Q  Okay.  And on the not so bad days, how often do you think you need to do that?  Just take --

A  Sometimes once or twice but I use bio freeze also and I get

**49**

little relief.  I'm starting not to feel that.  That's what, just discussed with my doctor in the last visit about going ten, fifteen, and he said that's a lot of nerves --

Q  Mm-hmm.

A  -- nerve damage.

Q  Now you mentioned the possibility of heavy duty narcotic pain medication.  Have you seen any doctors about that to talk about that?

A  Well Dr. Richman had said he doesn't want me, you know, to be on the medication like that and depend on that.  And I said okay, you know, what else, what else can we do.

Q  All right now did you talk to Dr. Richman recently about the possibility of another surgery?

A  Yes.

Q  And what was that discussion about?  What did he say, what did you say?

A  He told me that I had L4 and L5 broke off and it's pressing on the nerves.  And that's describing everything that's going on and they had it on the MRI.  And then he, and I really wasn't pressing, you know, for the surgery.  I'm a little worried.  And he said, you know, I can try.  That's when he prescribed Neurontin again to try.  And I have little relief from that, but it's still there.  And he told me that I was too young to have this.  I need the surgery because eventually I'm not going to be able to walk.

Q  They said you were too young to get the surgery?

A  No, I'm sorry.  Too young to have this going on --

Q  Mm-hmm.

**50**

A  -- need to get the surgery and he says three out of four,
fingers crossed, work.

Q  And did you say to Dr. Richman okay, let's go ahead and get
that surgery?

A  No.  I'm scared.  So he tried me, he suggested some yoga,
maybe some strengthening would help.

Q  Mm-hmm.

A  And I was in the midst of doing that, you know, checking out
some places.  And then I was in a car accident October 24th.

Q  And did you have to go to the hospital for that?

A  Yes, I did.  Went to the ER, Mercy ER.

Q  And did they keep you in the hospital?

A  No.

Q  All right.  Now have any of the medications you've taken, do
you think they've caused you any problems or side-effects?

A  Well I also take Ibuprofen which causes stomach issues.  So I
take that three to four days, back off a little bit.  And then he
prescribed Tramadol also.  And I haven't had that many issues with
that.  That seems to be okay.

Q  All right.  I ask everyone these questions, ma'am.  At any
time in your life, have you ever had any kind of problem or difficulty
with drugs or alcohol?

A  No.

Q  Has anyone ever told you they were concerned about your use of
drugs or alcohol?

A  No.  Well, Dr. Richman, when he had stated he just doesn't

want me to be dependent on those.  And that's it.

Q  All right, Mr. Bowen, if I understand Ms. Fontana correctly, she's saying that she would very frequently need breaks from even sitting and sitting kind of job due to the pain she's experiencing in her back.  And on bad days, these would be two to three breaks. Ma'am, about how often bad days versus not so bad days, how would you say that pattern's been over the past couple years?  Half the time, three quarters of the time?

A  It's gotten worse within my last year to where I was, you know, the pain, the sciatic pain, excruciating --

Q  Yeah.

A  -- and that's, you know, and I'm thinking okay, grin and bear it, you know.  And it just, and then I went back and that's when Dr. Richman had told me, you know, even out to where you have to do this.

Q  Mm-hmm.  All right, and you went through Mercy Hospital's social work office or whatever to see what kind of help you could get with your medical care?

A  Yes.

Q  But your husband's job doesn't provide insurance for you?

A  No.

Q  Did you try to go through what people commonly call Obama care?  It's the affordable care act.  Did you make some attempt to get it --

A  Yes.  That's the recent one I just did.  I applied for Chip for my daughter, the Chip program for my daughter.

**52**

Q  But what about for you?  Did you try to get --

A  Yes, I did attempt --

Q  -- through --

A  -- I applied also and I was put on the waiting list for the Chip program.

Q  Mm-hmm.

A  Or adult Chip, they called it.  And then recently was the Obama care.

ALJ:  All right, Mr. Bowen.  I think I understand what Ms. Fontana is telling us about why she can't work.  But if you think there's a need to develop the record further you may.  And I'll just tell you, and I've worked with you.  I don't like that representatives ask the same questions I ask --

ATTY:  Right.

ALJ:  -- in the same area.  And I keep the inquiry to the factors we use in evaluating these --

ATTY:  Right.

ALJ:  -- cases and I don't like to try to get them to explain what their MRI shows and things --

ATTY:  Right.

ALJ:  -- like that.  I get that from the doctors.

ATTY:  Right --

ALJ:  But if you, if there's any areas that you need to explore further, you may.

EXAMINATION OF CLAIMANT BY ATTORNEY:

Q  I think just for clarification because basically your

**53**

questions laid out exactly what she can't do.  But I don't think you answered the Judge's questions when he asked you about the frequency of the breaks.  Your reply was it's increasing, but seven days a week, how many days is good, how many days are bad --

A   Oh, I'm sorry.  Lately I've been experiencing bad days. Majority of my days are bad.

Q   So out of seven days --

A   Say, five.

Q   Five?

A   Five.

Q   You described also your rest patterns, your rest periods. What's the duration of the rest period?

A   Most of the --

Q   Minutes, hours --

A   Sometimes 30 minutes, a half hour usually.  Half hour to an hour is good.

Q   And then you were describing how you've managed your pain and I don't think you really, you talked about certain things but is there a certain pattern you follow to manage your pain?

A   Yes.  I start a day as a hot shower, bio freeze, the heating or the ice, pain medication.  That's a daily routine

Q   And how long does that routine last?

A   Every day. I start every day (INAUDIBLE) times.

Q   When you start it in the morning and you finish it in the morning, how long does it last?

A   I guess about an hour by the time I --

**54**

Q   Did you ever use pain patches?

A   Yes.

Q   And what happened?

A   I had a reaction, rash, hives.

Q   Based on what you told the Judge, is it possible that you could be a ticket taker at the movie theater knowing what you know?

A   Yes, to be able to take breaks every ten to fifteen minutes (INAUDIBLE).

ATTY:  Okay.  I have no further questions.  Thank you.

CLMT:  I'm sorry.  I'm nervous.

ALJ:  All right.

(The Vocational Expert, SAMUEL EDELMAN, having been first duly sworn, testified as follows:)

EXAMINATION OF VOCATIONAL EXPERT BY ADMINISTRATIVE LAW JUDGE:

Q   Mr. Edelman, the exhibit we have in the file that describes your qualifications, does it accurately state them?

A   It does.

Q   And have you and I discussed this case?

A   We have not.

Q   And do you know Ms. Fontana or have any kind of connection to her outside of the hearing?

A   No, Judge.

Q   Does the fact that the Social Security Administration pay you for your time have any impact on your testimony?

A   No.

ALJ:  All right.  Mr. Bowen, any questions or challenge to Mr. Edelman's qualifications or potential bias as a vocational expert?

**55**

ATTY:  No, Your Honor.

Q  All right.  Would you summarize her work history in terms of job title, skill level and exertional level?

VE:  May I ask her one question, Judge.  Ma'am, I saw that you were a nurse aide, 2001 to 2002.  Were you certified by the state?

CLMT:  No.

VE:  Thank you.  Okay.  Claimant's past work as a truck loader, it's heavy, unskilled.  Nurse aide without certification, medium to heavy and unskilled.  And a self-employed title searcher, which is light, unskilled, SVP: 5.

ALJ:  Ma'am, when did you do the title searching work?

CLMT  Oh, God.  That's where I had the (INAUDIBLE).  I think it was 2/04, maybe 2/05.

ALJ:  And why did you stop doing that?

CLMT:  I'm pretty sure I went into the nursing aide.

Q  All right, Mr. Edelman, would you please assume a hypothetical individual with the Claimant's education, training and work experience.  And this person could lift and carry 20 pounds occasionally, ten pounds frequently.  This person could stand or walk for four hours in a typical work day.  This person could sit for four hours in a typical work day.  They should be afforded the option of doing the work sitting or standing, changing positions at a maximum frequency of 30 minutes.  This person would be limited to occasional bending and kneeling, never stooping, crouching, balance and climbing. The person is limited to simple routine and repetitive tasks that are not fast paced.  Only simple work decisions.  Would such a person be

**56**

able to perform any of the jobs you listed as past work?

A  No.

Q  Are there other jobs in the national or local economy that such a person could perform?

A  I would suggest cashier II, the *DOT* number is 211.462-010. This is light, SVP: 2.  With the limitations given, approximately 26,000 jobs nationally, just a second, please.  Photo copying machine operator, 207.685-014, light, SVP: 2.  Approximately 18,000 nationally.  Or folding machine operator, 208.685-014, light, SVP: 2. Approximately 2,900 nationally.

Q  All right.  Are there, if I added to that hypothetical that the person is going to need to take three half hour breaks per day on average.  And these are going to be unpredictable.  And this is going to be an ongoing pattern.  Are there jobs in the national local economy that such a person could perform?

A  No.  She could not maintain employer expectations with that need for breaks.

Q  All right.  Are there any conflicts between your testimony and the definitions provided in the *Dictionary of Occupational Titles*?

A  Yes.  The *DOT* does not speak for the sit, stand option. Numbers I've used are reduced based on my observation, these specific jobs in the national economy and the observation of other vocational experts in the field.  Other than that, it is consistent.

Q  And what are the method and sources you used to derive the number of jobs?

A  I use Job browser pro, a software program which defines number

**57**

of jobs based on the base of the Department of Labor figures into specific *DOT* titles.

ALJ:  And Mr. Bowen, any questions for the vocational expert?

ATTY:  No, sir.

ALJ:  All right.  So I'll need to make sure I have all the medical evidence before I decide the case.  So in 30 days I'll look at the file.

ATTY:  Yes, sir.

ALJ:  And if I see your letter in there saying Judge, all the evidence is in, then I'll move to decide the case.

ATTY:  Yes, sir.

ALJ:  If you get it sooner than that, you can put a note saying Judge, it's all here.  That will alert the staff to put the case in the pile of cases to be decided.  In 30 days if I don't see anything further, I'll assume nothing more exists and the evidence is complete. So the default position will be, if you don't respond, then I'll assume the evidence is complete.

ATTY:  I understand, Your Honor.

ALJ:  But ma'am, when I get that evidence I need, I'll take a careful look at it.  And, you know, I would say that you came across as a credible person.  You didn't, when I asked you could you do the ticket taker job, you thought you probably could.  But then I had to draw out of you the limits and that actually works towards making you seem like a more credible person.  There are a lot of people that come in here and just seem --

CLMT:  Oh, I want to work, believe me.  I had a good job --

**58**

ALJ:   -- like they can't do anything ---

CLMT:   -- at OK Grocery --

ALJ:   -- any time --

CLMT:   -- I want to work.

ALJ:   And so I don't know the final answer yet.  I have to make sure I have all the complete medical evidence and make sure what you're saying checks out with that.  But I would say, you know, you did impress me as someone who's just trying to answer the questions and --

CLMT:   Yeah.  I'm nervous too.

ALJ:   -- you know, honestly talk about what's going on in your life as opposed to, some people come in ready to argue and explain --

CLMT:   Well, I want to work --

ALJ:   -- that everything --

CLMT:   -- I just, my whole quality of life has changed.  I can't, no, that's, no, big, wow.

ALJ:   And I just would also say I'm not a doctor.  You have to follow your doctor's advice but I've seen a lot of people like you go for the narcotics and get hooked and get their life ruined.  And I think you made a very wise choice based upon medical experts I've heard testify and a lot of people I see here, you haven't gone down that path of, yeah, they'll make you feel good --

CLMT:   Yeah, right. I've refused them a few them a few times --

ALJ:   -- but there are, there are long term consequences to those that are, I mean there's a documented epidemic of people getting addicted to narcotics prescribed by doctors.  That's a known

**59**

phenomenon.

CLMT:  Right.  I had chose to, you know, I asked him what can I do.  And he suggested yoga and I'm like okay.  You know, if I can do some strengthening, you know, I'll try.

ALJ:  Right.  And again, you know, you follow your doctor's advice but yoga tends to require good strength of the muscles.

CLMT:  Oh, okay.

ALJ:  But it doesn't necessarily, just in my humble opinion --

CLMT:  Okay, I don't --

ALJ:  -- maybe I shouldn't be telling you this.  But something like Pilates builds that core muscles you need to stabilize your spine to help.  But you --

CLMT:  Okay.

ALJ:  -- you know, you talk to your doctor --

CLMT:  Yeah.

ALJ:  -- or your physical therapist.  That's just my --

(The hearing closed on December 3, 2014.)


C E R T I F I C A T I O N

I have read the foregoing and hereby certify that it is a true and complete transcription of the testimony recorded at the hearing held in the case of Trish Ann Fontana, before Administrative Law Judge John J. Porter.

*Amanda Harkless /lb*

Amanda Harkless, Transcriber
Free State Reporting, Inc.

*Leah Becker*

Leah Becker, Proofreader
Free State Reporting, Inc.